J-S35001-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: E.R.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: C.G., GRANDMOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 906 MDA 2025 |

Appeal from the Order Entered May 29, 2025
In the Court of Common Pleas of Lebanon County Orphans' Court at
No(s):  2023-760

| | | |
|---|---|---|
| IN RE: ADOPTION OF: L.N.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: C.G., GRANDMOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 907 MDA 2025 |

Appeal from the Order Entered May 30, 2025
In the Court of Common Pleas of Lebanon County Orphans' Court at
No(s):  2023-759

BEFORE:  OLSON, J., MURRAY, J., and LANE, J.

MEMORANDUM BY OLSON, J.:                    **FILED JANUARY 23, 2026**

Appellant, C.G., appeals *pro se* from the May 30, 2025 orders denying her petitions for adoption of her granddaughter, E.R.H., born in June of 2019, and grandson, L.N.R., born in February of 2022 (collectively, "the Children"), and granting the competing adoption petitions filed by Appellees, S.F.V.

("Foster Father") and L.Y.B. ("Foster Mother") (collectively, "Foster Parents").

Upon careful review, we affirm.

In its opinion accompanying the subject orders, the orphans' court set forth the following factual and procedural history, which the record evidence supports.

> V.R. ("Mother") and C.R. ("Father") are the biological parents of the Children. Lebanon County Children and Youth Services (hereinafter "CYS" or "the Agency") first became involved with the family on May 2, 2022, as a result of incarceration and drug use by Mother and Father. At that time, the Children were living with [Appellant,] the maternal grandmother. On June 1, 2022, while in the care of [Appellant], CYS received a second referral, and a safety plan was put in place.
>
> On June 3, 2022, Father signed a voluntary placement agreement and the Children were placed into a CYS approved foster home with Foster Parents. [Appellant] applied to the Agency to be considered as a kinship placement but was rejected. [Appellant] also applied to be a kinship foster parent through the Bair Foundation and was denied. On August 1, 2022, the Children were found dependent. On September 26, 2023, CYS filed a petition for the involuntary termination of parental rights for both Mother and Father. Following a hearing, the parental rights of Mother and Father were terminated on December 18, 2023. The Children have remained in the care of Foster Parents since July 13, 2022.
>
> On January 2, 2024, [Appellant] filed petitions for adoption of the Children. On January 4, 2024, Foster Parents filed petitions for adoption of the Children. [Appellant] also filed a complaint for custody against Mother and Father on October 27, 2023. On March 6, 2024, the court entered an order ruling that, because there was an adoption hearing scheduled regarding the two separate adoption petitions, the custody complaint was dismissed. [Appellant] filed a timely appeal to the Superior Court of Pennsylvania. While the appeal was pending, the court conducted evidentiary hearings on the contested adoption petitions on June 25, 2024, August 15, 2024, September 9, 2024, and [October] 17, 2024. The testimony covered the entire procedural history of

the dependency matters which resulted in the termination of parental rights of the biological parents. The testimony also covered the current status of the Children.

Orphans' Court Opinion, 5/30/25, at 2-3 (cleaned up).[1] Both Appellant and Foster Parents were represented by counsel during the hearing. In addition, the Children's legal interests were represented during the hearing by John J. Ferry, Jr., Esquire, and their best interests were represented by Caleb J. Zimmerman, as guardian *ad litem*.

The orphans' court aptly summarized the testimony of each and every witness presented during the hearing, which included Dr. Ray W. Christner, who performed a clinical psychological evaluation on Appellant; Dr. Marita Lind, the medical director of the Child Advocacy Center at Geisinger Medical Center; Rene Ilgenfritz, Appellant's friend; Appellant; Foster Father; Mother; Foster Mother; and CYS caseworkers, Linsy Moyer, Brianna Morgan, and Baily Van Fleet-Horan. ***See id.*** at 3-13.

The court credited Dr. Lind's testimony, the substance of which resulted in the Children's removal from Appellant in June of 2022. The court summarized her testimony, as follows.

Dr. Lind was certified as an expert in the area of child abuse. Dr. Lind testified that she saw the Children when [Appellant] took them to Hershey Medical Center for concerns of sexual abuse and

_____

[1] This Court subsequently affirmed the aforesaid order issued by the trial court that dismissed Appellant's custody complaint. ***See Godwin v. Leb. Cnty. Child. & Youth Servs.***, 331 A.3d 621 (Pa. Super. 2024) (non-precedential decision).

possible physical abuse. Due to the allegations of abuse, CYS was contacted, and the Children were kept at the hospital for testing and examinations and until a safety plan could be put in place. After conducting an evaluation of the Children, Dr. Lind found no signs of sexual or physical abuse.

However, Dr. Lind did testify regarding concerns she had with the youngest child, L.N.R., who was four months old at the time. The concerns stemmed from L.N.R. being fed formula with goat milk and given water [by Appellant]. Dr. Lind explained that feeding an infant goat milk and water could cause health complications such as lowering the infant's sodium and electrolyte levels, which can lead to seizures or issues with kidney function. At the time L.N.R. was evaluated in the hospital, his electrolytes and sodium levels were normal and there were no signs of malnutrition. However, Dr. Lind did emphasize that longer use of goat milk and water could increase the risk of health complications.

The court also heard testimony from Dr. Lind regarding concerns she had relating to [Appellant]'s emotional and mental well-being. During her testimony, Dr. Lind noted the interactions with [Appellant] as being "unusual." She described [Appellant] as variable in her emotion, her pace of speech, and her volume throughout the entire interaction. Dr. Lind testified that [Appellant] made many unusual statements which made it difficult to obtain information and medical history for the Children. The statements Dr. Lind referenced included witches changing medical records and concerns that L.N.R.'s eyes turned black because he was possessed with evil.

Orphans' Court Opinion, 5/30/24, at 4-5 (cleaned up).

In addition, the court credited the testimony of the CYS caseworkers. The court emphasized Ms. Moyer's description of an office visit she had with Appellant "a few days after" the Children's placement. Orphans' Court Opinion, 5/30/25, at 11. Ms. Moyer explained that the purpose of the office visit was to provide Appellant "an opportunity . . . to present evidence that she said she had regarding the [biological]

parents' neglect" of the Children. N.T., 10/17/24, at 6-7. Ms. Moyer testified that Appellant brought to the visit "baggies of [the Children's] earwax and snot, as well as reports of the Children's bowel movements." Orphans' Court Opinion, 5/30/25, at 11. The court noted Ms. Van Fleet-Horan's testimony that, by Appellant "documenting and saving the Children's earwax and nasal drip and [by her] thinking it was pertinent to [the Children's] development," demonstrated that Appellant had "unreasonable beliefs" regarding the growth and development of the Children. *Id.* at 13. Ms. Van Fleet-Horan testified that this, along with CYS's concerns regarding Appellant's mental health, *inter alia*, resulted in CYS denying Appellant's request to be a kinship placement for the Children during their dependencies. *Id.*

The court found, through the testimony of Ms. Morgan, who scheduled supervised visits, that Appellant attended, in total, five visits wherein she raised "multiple concerns" regarding Foster Parents' care of the Children. *Id.* at 12. Ms. Morgan testified that CYS investigated the concerns raised by Appellant, and they were "unfounded." *Id.* Further, she testified that the investigations "became disruptive to the Children's daily lives." *Id.* The court also emphasized that Ms. Morgan did not observe "any notable bond" between the Children and Appellant. *Id.* However, she observed that a bond exists between the Children and the Foster Parents. *Id.* at 12-13. As such, Ms. Moyer testified that the Agency "consents to the Foster Parents' petition to

adopt the Children but would not consent to the petition to adopt by" Appellant. *Id.* at 12 (cleaned up).

With respect to Appellant, the court found relevant, in part, her testimony that "because of [Appellant's] spiritual and biblical beliefs, and as head of the family, she wants to raise the Children. She further testified that she believes she is the best caretaker for the Children because she is a blood relative and has traditions of the family bloodline that the Children should grow up with." Orphans' Court Opinion, 5/30/25, at 8.

Finally, the court summarized the testimony of Foster Parents, as follows.

> [Foster Father] testified that Children have lived with him and his wife since July 2022. [Foster Father] and [Foster Mother] have three other children, two biological sons and one adopted son. Foster father testified that all the children, including L.N.R. and E.R.H., get along well. Both [Foster Father] and [Foster Mother] described the Children's interests as well as activities they like to do as a family. The Foster Parents described spending time outside, playing sports, riding bikes, camping and going to amusement parks. They also spoke about family traditions such as celebrating holidays and birthdays together as well as being involved in the church. Both [Foster Father] and [Foster Mother] testified that E.R.H. is enrolled in speech therapy through her school. [Foster Mother] testified that she ensures that the Children are receiving the proper medical care and treatment they need. Both Foster Parents have family and friends nearby or who they see often that are close to the Children and treat them as part of the family.
>
> Additionally, both [Foster Father] and [Foster Mother] testified that the Children call them "papa and mama" and view them as their parents. [Foster Father] testified he believes it is best for the Children to remain with them because they love them like their own children and would do anything to give them the best life they could. [Foster Mother] reiterated the same belief and stated that

they provide the Children with a safe environment. [Foster Mother] added that they not only provide the Children with necessities like food and clothes but also play with them and learn with them. Both Foster Parents also testified that they believe taking the Children away from them would have a negative impact on them and confuse them due to the amount of time that the Children had been with them and the bond they share.

Orphans' Court Opinion, 5/30/25, at 8-9 (cleaned up).

By orders dated May 29, 2025, and entered on May 30, 2025, the court granted Foster Parents' petitions for adoption and denied Appellant's petitions. The court accompanied the orders with a comprehensive opinion.

Appellant, acting *pro se*, timely filed notices of appeal and concise statements of errors asserted on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b), which this Court consolidated *sua sponte*. On July 21, 2025, the court filed its Rule 1925(a) opinion.

On appeal, Appellant presents the following issues for review:

1. Whether the [orphans'] court erred and abused its discretion by denying Appellant's adoption petitions and granting adoption to nominating in foster parents, despite establish in loco parentis and legal guardianship status, in violation of 23 Pa.C.S. §§ 2511, 2512, 5328(a)(7), and has additional rights under the Fourteenth Amendment[?]

2. Whether the [orphans'] court erred by suppressing Appellant's religious rights and disregarding protections under the First and Fourteenth Amendments, where CYS workers and the [c]ourt and engaged in coercive, disparaging, and unequal treatment of Appellant's faith and family traditions[?]

3. Whether Appellant was denied effective assistance of counsel and meaningful advocacy, where appointed and retained counsel failed to protect Appellant's rights, investigate evidence, challenge false allegations, or properly preserve issues for appeal, in violation of due process[?]

4. Whether the [orphans'] court failed to apply the kinship preference and Act 101 of 2010, and erred in concluding that post-adoption contact and preservation of family bonds were not required or in the [C]hildren's best interests, despite statutory mandates favoring continuity of familial relationships[?]

5. Whether the [orphans'] court erred by excluding or minimizing critical evidence, including pre-existing guardianship affidavits, medical records (e.g., goat milk formula discharge papers), and testimony regarding foster parent misconduct, thereby violating due process and Appellant's constitutional right to a fair hearing[?]

6. Whether the [orphans'] court erred by permitting procedural delays and unequal treatment, where Appellant was subjected to extended examination (over 6.5 hours) compared to less than one hour for Foster [Parents], and where transcript delays and briefing schedule irregularities deprived Appellant of Children's Fast Track protections under Pa.R.A.P. 102 and 2187(b)[?]

7. Whether the [orphans'] court erred by disregarding evidence of retaliatory and coercive actions by [F]oster [P]arents and CYS and – including false PFA filings, restrictions on visitation, and interference with the [C]hildren's familial bond – constituting violations of due process and Appellant's right to familial association under the Fourteenth Amendment[?]

Appellant's Brief at 1-2.[2, 3]

---

[2] Foster Parents and CYS filed a joint appellee brief advocating for this Court to affirm the subject orders. In addition, Attorney Ferry filed an appellee brief on behalf of the Children in support of the orders.

[3] Appellant has waived any claims relating to the United States Constitution and the Pennsylvania Constitution for failure to include them in her concise statements of errors complained of on appeal. *See In re M.Z.T.M.W.*, 163 A.3d 462, 466 (Pa. Super. 2017) ("[I]t is well-settled that issues not included in an appellant's . . . concise statement of errors complained of on appeal are waived.") (citing *Krebs v. United Refining Co. of Pa.*, 893 A.2d 776, 797 (Pa. Super. 2006)).

We have reviewed the briefs of the parties, the relevant law, the certified record, and the opinions of the able orphans' court judge, the Honorable Charles T. Jones, Jr. We conclude that Appellant is not entitled to relief in this case, for the reasons expressed in Judge Jones' May 30, 2025 and July 21, 2025 opinions. Therefore, we affirm on the basis of Judge Jones' able opinions and adopt them as our own. In any future filing with this or any other court addressing this ruling, the filing party shall attach a copy of Judge Jones' May 30, 2025 and July 21, 2025 opinions, with the names of Appellant, Mother, Father, the Children, and the Foster Parents redacted.

Orders affirmed. Jurisdiction relinquished.

Judgment Entered.

_____

Benjamin D. Kohler, Esq.
Prothonotary


Date: 01/23/2026



COPY

# IN THE COURT OF COMMON PLEAS
## OF LEBANON COUNTY, PENNSYLVANIA

### ORPHANS' COURT DIVISION

IN RE: ADOPTIONS

OF

E.R.H. , and

L.N.R.

:
:
:
:
:
:
:

**Docket No.: 2023-759, and**
**Docket No.: 2023-760**

### ORDER OF COURT

AND NOW, to wit, this 29th day of May 2025, after careful consideration of the record and the Briefs of the Parties, the Petition for Adoption by *Foster Parents* and L___ of the Minor Children, L.R. and E.H., is **GRANTED.** Accordingly, the Petition of Adoption by *Appellant* is **DENIED.**

BY THE COURT:

_____, J.
CHARLES T. JONES, JR.

cc:     Lebanon County Children and Youth Services
        Roberta J. Santiago, Esquire – Attorney for
        John J. Ferry, Jr., Esquire – Legal Counsel for the Minor Children
        Caleb J. Zimmerman, Esquire – Guardian Ad Litem
        Marc Anthony Scaringi, Esquire – Attorney for C

# IN THE COURT OF COMMON PLEAS
## OF LEBANON COUNTY, PENNSYLVANIA

### ORPHANS' COURT DIVISION

| | |
|---|---|
| IN RE: ADOPTIONS | : |
| | : |
| OF | : Docket No.: 2023-759, and |
| | : Docket No.: 2023-760 |
| E.R.H. , and | : |
| E" L.N.R. , | : |
| | : |

### APPEARANCES:

Roberta J. Santiago, Esquire      For S'      and

John J. Ferry, Jr., Esquire      For the Minor Children

Caleb J. Zimmerman, Esquire      Guardian Ad Litem

Marc Anthony Scaringi, Esquire      For C____

### OPINION BY JONES, JR., J.:

### FACTUAL & PROCEDURAL HISTORY

The instant action is a contested adoption of minor children L.R. and E.H. (hereinafter "Minor Children"). V. R. ------- (hereinafter "Mother") and ·C- R- (hereinafter "Father") are the biological parents of the Children. Lebanon County Children and Youth Services (hereinafter "CYS") first became involved with the family on May 2, 2022, as a result of incarceration and drug use by Mother and Father. At that time, the Children were living with the maternal grandmother, C-G__ _____ (hereinafter "Appellant "). On June 1, 2022, while in the care of Appellant , CYS received a second referral, and a safety plan was put in place.

2

On June 3, 2022, Father signed a Voluntary Placement Agreement and the Children were placed into a CYS approved foster home with S. F. V. and L. Y. B. (hereinafter "Foster Parents"). Appellant applied to the Agency to be considered as a kinship placement but was rejected. Appellant also applied to be considered as a kindship foster parent through the Bair Foundation and was denied. On August 1, 2022, the Minor Children were found dependent. On September 26, 2023, CYS filed a Petition for the Involuntary Termination of Parental Rights for both Mother and Father. Following a hearing, the parental rights of Mother and Father were terminated on December 18, 2023. The Children have remained in the care of Foster Parents since July 13, 2022.

On January 2, 2024, Appellant filed a Petition for Adoption of the Minor Children. On January 4, 2024, Foster Parents filed a Petition for Adoption of the Minor Children. Appellant also filed a Complaint for Custody against the biological Mother and Father on October 27, 2023. On March 6, 2024, the Court entered an Order ruling that because there was an adopting hearing scheduled regarding the two separate adoption petitions, the custody complaint was dismissed. Appellant filed a timely appeal to the Superior Court of Pennsylvania. While the Appeal was pending, the Court conducted evidentiary hearings on the contested adoption petitions on June 25, 2024, August 15, 2024, September 9, 2024, and November 17, 2024. The testimony covered the entire procedural history of the Dependency Matters which resulted in the Termination of Parental Rights of the biological parents. The testimony also covered the current status of the Children.

At the Hearing on June 25, 2024, the Court heard testimony from Dr. Ray Christner, a forensic psychologist. Dr. Christner testified regarding a mental health evaluation he conducted on Appellant on February 3, 2022. Dr. Christner testified he felt Appellant was forthcoming and truthful during her evaluation but that she seemed to be minimizing symptoms. (Transcript of Proceedings, (hereinafter

3

"N.T."), June 25, 2024, at 26.) Dr. Christner also stated that *Appellant* appeared to try to portray herself in a positive light which he said was common in evaluations that dealt with custody issues. (N.T. 18-19.) Dr. Christner testified that he believes *Appellant* suffers from a stress-related disorder. (N.T. 20.) He explained that stress-related disorder can simply mean that sometimes stressors can be higher than an individual's ability to cope with them. (Id.)

Additionally, Dr. Christner testified that there was no indication of mental illness that would suggest that *Appellant* could not be a part of the Minor Children's lives. (N.T. 21-22.) Dr. Christner clarified that he did not personally evaluate the children in this case. (N.T. 33.) However, from his professional experience, he acknowledged that it would be a difficult and gradual process to reintroduce and place the Minor Children with *Appellant* given the time the children have been in the care of the Foster Parents. (N.T. 33-34.)

The Court also heard testimony from Dr. Marita Lind, the medical director of the Child Advocacy Center at Geisinger Medical Center. Dr. Lind was certified as an expert in the area of child abuse. (N.T. 42-44.) Dr. Lind testified that she saw the Minor Children when *Appellant* took them to Hershey Medical Center for concerns of sexual abuse and possible physical abuse. (N.T. 45.) Due to the allegations of abuse, CYS was contacted, and the Minor Children were kept at the hospital for testing and examinations and until a safety plan could be put in place. (N.T. 57.) After conducting an evaluation of both Children, Dr. Lind found no signs of sexual or physical abuse. (N.T. 50-53, 57, 65.)

However, Dr. Lind did testify regarding concerns she had with the youngest Child, L.R., who was four (4) months at the time. The concerns stemmed from L.R. being fed a formula with goat milk and given water. (N.T. 53-54, 75-77.) Dr. Lind explained that feeding an infant goat milk and water could cause health complications such as lowering the infant's sodium and electrolytes levels, which

4

can lead to seizures or issues with kidney function. (Id.) At the time L.R. was evaluated in the hospital his electrolytes and sodium levels were normal and there were no signs of malnutrition. (N.T. 62-63, 68-69.) However, Dr. Lind did emphasize that longer use of goat milk and water could increase the risk of health complications. (N.T. 76- 77.)

The Court also heard testimony from Dr. Lind regarding concerns she had relating to Appellant' emotional and mental wellbeing. (N.T. 55-56, 59-61, 69, 79-80.) During her testimony, Dr. Lind noted the interactions with Appellant as being "unusual". (N.T. 55.) She described Appellant as variable in her emotion, her pace of speech, and her volume throughout the entire interaction. (Id.) Ms. Lind testified that Appellant made many unusual statements which made it difficult to obtain information and medical history for the Minor Children. (N.T. 60, 70.) The statements Ms. Lind referenced included witches changing medical records and concerns that L.R.'s eyes turned black because he was possessed with evil. (N.T. 56, 60-61.)

The Court also heard from a friend of Appellant's, Rene Ilgenfritz. Ms. Ilgenfritz testified that she knew Appellant when she cared for the Minor Children and said she never observed the children to be malnourished or neglected. (N.T. 90.) Ms. Ilgenfritz described the interactions she observed between the children and Appellant, and stated Appellant was always attentive to the children. (N.T. 89.) Ms. Ilgenfritz did state that she no longer sees Appellant often because Appellant was currently working multiple jobs and moved around often. (N.T 93-94.)

The hearing continued on August 8, 2024, at which time the Court heard testimony from Appellant.[1] Appellant testified that she lived with the Minor

---

[1] Appellant provided nearly six and a half hours of testimony. However, much of the testimony focused around old grievances and complaints related to how CYS handled the case, rather than facts probative to a disposition of the best interest of the Minor Children. Therefore, the Court has attempted to concisely summarize the relevant points of Appellant's testimony.

5

Children from birth until CYS intervened. She explained that her daughter was unable to care for the Minor Children due to incarcerations and drug use. (N.T., August 15, 2024, at 114-115.) Appellant testified that is when she took on the responsibilities of providing for the Minor Children's physical and emotional needs as well as their spiritual needs. (N.T. 114.) She explained the parental duties she performed for the Minor Children while under her case included feeding, clothing, and comforting, taking E.H. to school, as well as taking the Minor Children to doctors' appointments. (N.T. 114-117, 121-122.) Appellant further stated she was the main financial support for the Minor Children at the time. (Id.) She also spoke about E.H.'s speech issues and how she got her enrolled in speech therapy. (N.T. 117.) At the time that the Minor Children were placed with the Foster Parents, E.H. had just turned three years old, and L.R. was four months old. Appellant also testified that when the Minor Children were placed in the foster home, she immediately contacted CYS to become a kinship resource for them. (N.T. 134.) Appellant stated CYS disapproved her as a kinship option and stated the reasons that were listed included mental health and lack of parenting skills/care for newborns. (N.T. 160-161.)

Appellant was questioned regarding the goat milk formula she was feeding L.R. She testified that she tried multiple different formulas but L.R. would not eat them or would get sick from them. (N.T. 136-138.) Appellant further stated that during COVID-19 there were formula recalls and shortages which made getting regular formula difficult. She then got a recommendation from a friend for a recipe that used goat milk. She also stated she was feeding L.R. rice cereal with water and milk based on recommendations from a doctor. (N.T. 142.) Appellant testified she was feeding L.R. the goat milk formula for about 6 weeks before CYS became involved and that she did not see any negative effects on L.R. (N.T. 143.)

6

Appellant acknowledged that she was aware of the risks or potential side effects of giving an infant goat milk formula such as lithium levels and liver issues. (N.T. 247.) However, she was not taking steps to check the newborn's levels at home. (Id.) Appellant also testified to a time L.R., who was a month old at the time, came home "lifeless". (N.T. 143-148.) She stated L.R. had come back from her ex-husband's house and described the infant as still, with grey skin, and darker eyes with less blue than before. (Id.) Appellant expressed that she was concerned that evil had been transferred to L.R. (N.T. 147.)

Appellant further testified about her supervised visits with the Minor Children. The Minor Children were removed June 2, 2022, and supervised visits began June 1, 2023. Appellant attended five visits in 2023 before she was no longer allowed to participate. Appellant described the visits and stated that E.H. would run over and jump into her arms and that E.H. was always happy to see her. (N.T. 170-172, 225-226.) She stated L.R. did not remember her and he was more drawn to his biological mother, M       but that he warmed up to her eventually. (N.T. 171-173, 224-225.)

The Court also heard testimony from Appellant relating to the Foster Parents. Appellant stated she was aware of Foster Parents and has concerns about the care they provide for the Minor Children. She brought up concerns about L.R.'s shoes being too small, bruises on E.H.'s legs, and E.H.'s hair being pulled too tight in braids. (N.T. 196-200.) Appellant also stated that she was concerned about the Foster Parents posting photos of the Minor Children online. (N.T. 203-205.) She explained that she was worried that other people will see the photos and think the Foster Parents are the Minor Children's "real family". (N.T. 221-222, 238.) However, Appellant when questioned, acknowledged that the photos do not show the Minor Children's faces. (N.T. 267.) Appellant was also asked about a

7

GoFundMe page she set up in which she references the Minor Children being placed by CYS as being "flat out kidnapping". (N.T. 271-278.)

*Appellant* testified she was currently residing in a two-bedroom home which she is leasing on a month-to-month basis. (N.T. 104-105, 207.) She stated that she has resided in the home for about a year and has prepared a room for the Minor Children. (N.T. 104, 207-209.) *Appellant* testified that because of her spiritual and biblical beliefs, and as the head of the family, she wants to raise the Minor Children. (N.T. 229-230.) She further testified that she believes she is the best caretaker for the Minor Children because she is a blood relative and has traditions of the family bloodline that the Minor Children should grow up with. (N.T. 305-306.)

At the Hearing on September 9, 2024, the Court heard testimony from the Foster Parents, *[ . . . . ]* M. S. F. V. testified that the Minor Children have lived with him and his wife since July 2022. (N.T., September 9, 2024, at 323-324.) *Foster Parents* have three other children, two biological sons and one adopted son. (N.T. 332.) SFV testified that all the children, including L.R. and E.H., get along well. (Id.) Both N *Foster Parents* described the Minor Children's interests as well as what activities they like to do as a family. The Foster Parents described spending time outside, playing sports, riding bikes, camping and going to amusement parks. (N.T. 335-336, 339, 351, 451-452, 454-455.) They also spoke about family traditions such as celebrating holidays and birthdays together as well as being involved in the church. (N.T. 335-337, 452-453.) Both *Foster Parents* testified that E.H. is enrolled in speech therapy through her school. (N.T. 340, 342, 450.) N LYB testified that she ensures that the Minor Children are receiving the proper medical care and treatment they need. (N.T. 448-449.) Both Foster Parents have

8

family and friends near by or who they see often that are close to the Minor Children and treat them as part of the family. (N.T. 337-338, 453-454.)

Additionally, both Foster Parents testified that the Minor Children call them "papa and mama" and view them as their parents. (N.T. 343, 377-378, 464.) SFV testified he believes it is best for the Minor Children to remain with them because they love them like their own children and would do anything to give them the best life they could. (N.T. 334-335, 465) LYB reiterated the same belief and stated that they provide the Minor Children with a safe environment. (N.T. 465.) LYB added that they not only provide the Minor Children with necessities like food and clothes but also play with them and learn with them. (Id.) Both Foster Parents also testified that they believe taking the Minor Children away from them would have a negative impact on them and confuse them due to the amount of time that the Minor Children have been with them and the bond they share. (N.T. 378, 468)

The Court also heard testimony from V.R. the Minor Children's biological mother. V.R. estified regarding her substance abuse issues and stated that it caused a strain on her relationship with her mother, Appellant (N.T. 384.) However, V.R. tated that her and Appellant have since rebuilt their relationship and are in a good place now. (Id.) VR testified that Appellant supported her while she was pregnant with E.H. and lived with her after E.H. was born to assist with caring for the newborn. (N.T. 385-387) VR stated Appellant was the one that taught E.H. the majority of things such as holding a bottle, walking, and potty training. (N.T. 388-389.) Furthermore, VR testified that Appellant provided E.H. with a sense of security and comfort and would be the one to step in when VR struggled with her addiction. (N.T. 389, 391.)

VR further testified regarding the birth of L.R. and that Appellant was again present for support and provided care for the newborn. (N.T. 397-398.)

9

She also explained that she was incarcerated shortly after L.R. was born and that Appellant stayed at V.R.'s apartment to care for the Minor Children. (N.T. 399.) V.R. was asked about the formula L.R. was being fed as a newborn. She indicated that she started breastfeeding L.R. but then switched to formula at one point. (N.T. 401.) V.R. explained that the infant was on multiple different formulas and never had any issues with them. (N.T. 401-403.) However, while she was incarcerated Appellant made her aware that she switched L.R. to a homemade goat milk recipe due to the formula shortage during COVID-19. (N.T. 404-405.)

V.R. testified she believes Appellant's petition to adopt the Minor Children should be granted because they are blood relatives and she has always provided and cared for them. (N.T. 412, 418.) V.R. stated if Appellant's Petition to Adopt was granted, she would keep her distance until Appellant thought it was appropriate for V.R. and the Minor Children to have contact again. (N.T. 412-414.) V.R. further testified that she believes the Minor Children would be negatively impacted if they were not to see Appellant again. (N.T. 420.) However, she also acknowledged that it would be difficult for the Minor Children to leave the Foster Parents due to the amount of time spent with them. (N.T. 421.) V.R. testified that Appellant has had little to no role in the Minor Children's lives since CYS intervened in June of 2022. (N.T. 419.) The last time Appellant saw the Minor Children was April 1, 2024. (N.T. 421.)

At the hearing on October 17, 2024, the Court heard testimony from three Children and Youth Services (CYS) caseworkers. First, the Court heard from Linsy Moyer. Ms. Moyer testified that she was the one that placed the Minor Children in their current Foster Home with Foster Parents (N.T., October 17, 2024, at 4.) Ms. Moyer testified that the Minor Children were in the care of Appellant when CYS first got involved. (Id.) Ms. Moyer further testified that she was

10

called to the Hershey Hospital due to staff concerns of a lack of an appropriate caregiver for the Minor Children. (N.T. 5-6.)

Ms. Moyer also testified regarding an office visit she had with Appellant where Appellant brought in a journal which contained baggies of earwax and snot, as well as reports of the Minor Children's bowel movements. (N.T. 6-8.) Ms. Moyer testified that CYS made Appellant aware of the process of becoming a kinship resource. (N.T. 8.) However, CYS ultimately denied her due to their concerns of mental health and concerns of financial ability, lack of parental skills with newborns, and uncertainty with housing. (N.T. 8-10, 13-14.) CYS gave Appellant further instructions to seek kinship through other resources and Appellant chose the Biar Foundation but was denied by them as well. (N.T. 10-11.) Ms. Moyer testified that from her knowledge she was denied by the Biar Foundation due to Appellant not completing the application and for harassing the agency with many phone calls. (N.T. 14-15.)

Ms. Moyer further testified that when she first became involved with the Minor Children, they were too young and had not bonded with anyone yet. (N.T. 17-18.) She explained that L.R. was only a couple months at the time and E.H. would run to anyone. (Id.) However, Ms. Moyer stated that as the Minor Children got older, she started to see the bond form between the Minor Children and the Foster Parents. (N.T. 18.) Ms. Moyer did testify regarding reports that were made to CYS against the Foster Parents. (N.T. 11-12.) However, Ms. Moyer explained that some of the reports did not rise to the level of concern to conduct an investigation, and that others were investigated but found to be invalid. (Id.) Ms. Moyer testified that the Foster Parents and their home were approved by CYS.[2] (N.T. 12.) She further stated that

---

[2] Parties entered a stipulation regarding the home study that was completed for the Foster Parents that indicated that they were approved. The Family Approval was conducted by Florence Wesley from the Pennsylvania Statewide Adoption and Permanency Network.

11

the agency consents to the Foster Parent's Petition to Adopt the Minor Children but would not consent to the Petition to Adopt by *Appellant* N.T. 39.)

The Court also heard testimony from CYS casework, Brianna Morgan regarding her responsibility of setting up visits between biological parents and Minor Children. (N.T. 47.) Ms. Morgan stated *Appellant* began to reach out in November of 2022 to set up visits with the Minor Children but was denied by CYS at the time due to concerns revolving around the kinship denial. (N.T. 49.) *Appellant* then reached out again in the spring of 2023 and was allowed to join the biological mother for visits. (N.T. 49-50.) *Appellant* began to attend the full hour visits in June 2023 but was later asked to only attend the first thirty minutes. (N.T. 50-51, 56.) Morgan testified that *Appellant* attended four visits before she was no longer permitted back due to not complying with the thirty-minute restrictions. (N.T. 51, 58-59.) *Appellant* was also no longer allowed to attend the visits due to the multiple concerns *Appellant* would raise regarding the Minor Children. (N.T. 56.) Ms. Morgan explained that all the concerns raised by *Appellant* were unfounded, but that each caused an investigation to be done, which became disruptive to the Minor Children's daily lives. (N.T. 56-58.)

Additionally, Ms. Morgan testified regarding the observations she made while attending visits with *Appellant* and the Minor Children after the Adoption Petition was filed. Ms. Morgan stated that the Minor Children struggled with transitions into the visits and needed the Foster Mother to help get them into the room and get them settled. (N.T. 60-61.) Ms. Morgan testified that during the first visit, L.R. cried the majority of the time until he fell asleep. (N.T. 67.) E.H. stayed on the other side of the room but eventually warmed up to *Appellant* .. (Id.) At the second visit L.R. cried less and E.H. sat and colored with *Appellant* the whole time. (Id.)

Ms. Morgan testified that she did not observe any notable bond between the Minor Children and *Appellant* . (N.T. 68.) Ms. Morgan further stated that at the

12

end of the visits the Minor Children were always happy to go back to Foster Parents. (Id.) Ms. Morgan testified that she observed a bond between the Minor Children and the Foster Parents and that the Minor Children refer to the Foster Parents as "mama and papa". (N.T. 62.) She further stated that the Minor Children do not refer to Appellant n anyway. (Id.)

CYS caseworker Bailey Van Fleet-Horan also testified. Ms. Van Fleet-Horan's position is to oversee caseworker's reports for investigations, including overseeing kinship resources. (N.T. 95-96.) Ms. Van Fleet-Horan testified that CYS originally denied Appellant as a kinship option due to mental health concerns and concern for lack of parenting skills of a newborn, as well as no housing being approved by the agency. (N.T. 96-97.) Upon cross-examination, Ms. Van Fleet-Horan stated that Appellant was not asked about her child's upbringing because the agency determined she was unable to care for newborns based on the Minor Children in this case. (N.T. 106-107.) Those concerns included the lack of nutrition L.R. was receiving. (N.T. 107.) Ms. Van Fleet-Horan explained CYS was also concerned about the unreasonable beliefs Appellant had on the development and growth of children that age. (Id.) She clarified these concerns through the example of Appellant documenting and saving the Minor Children's earwax and nasal drip and thinking it was pertinent to their development. (Id.)

At the conclusion of the hearing on November 17, 2024, Counsel was ordered to file briefs due by December 9, 2024. Furthermore, this Court acknowledged that no decision regarding the adoption will be made until after the Superior Court has decided the above-captioned appeal. On December 24, 2024, the Superior Court Remanded the Case back to the Trial Court after Affirming the trial court's decision to dismiss Appellant's Complaint for Custody.

On December 4, 2024, Grandmother filed a Motion to Request Extension for Filing Briefs until all transcripts were completed. This Motion was Granted and the

13

deadline to file briefs on this matter was extended to fourteen (14) days after all transcripts were lodged with the Court. The final transcript of proceedings was filed on January 27, 2025. On February 10, 2025, Foster Parents filed a Brief in Support of their Petition for Adoption of the Children. Also on February 10, 2025, the Guardian Ad Litem filed a Brief regarding the Contested Adoption. On February 11, 2025, Appellant filed a Brief in Support of her Petition to Adopt. On February 12, 2025, the Attorney for the Children filed a Memorandum in Support of the Petition for Adoption by the Foster Parents.

## DISCUSSION

On January 2, 2024, and January 4, 2024, SFV and LYB _____, _ _____, Foster Parents to the Minor Children, and Appellant , maternal grandmother of the Minor Children, filed contesting Petitions for Adoption of the Minor Children. The Guardian Ad Litem in this case stated in his brief that he had the opportunity to view the home of the Foster Parents and the home of Appellant. Additionally, he had the opportunity to see the Minor Children interact with both the Foster Parents and Appellant. The Guardian Ad Litem was also present during the four days of testimony in this case. In his brief, the Guardian Ad Litem concludes it is in the best interest of the Minor Children for the Court to grant the Foster Parent's Petition for Adoption. Counsel for the Minor Children was also present at the hearings relating to the contested adoption and stated in his Memorandum of Support that he believes it is in the best interest of the Minor Children to be adopted by Foster Parents.

Adoptions in Pennsylvania are governed by 23 Pa.C.S. § 2101 et seq, the "Adoption Act". The Act establishes various procedures that must be followed and provides for the testimony and investigation required in regard to an Adoption Petition. Pursuant to the Adoption Act, "[t]he court shall hear testimony in support

14

of the petition and such additional testimony as it deems necessary to inform it as to the desirability of the proposed adoption." **23 Pa.C.S. § 2724(a).** Section 2724 sets forth that, in evaluating an adoption petition, "the court shall decide its desirability on the basis of the physical, mental and emotional needs and welfare of the child." **Id.**

The Pennsylvania Superior Court has found that "[i]n adoption matters, the paramount concern is the best interest of the child." *In re Adoption of A.S.H.*, 674 A.2d 698, 700 (Pa. Super. 1996.) This "best interests" determination is made on a case-by-case basis and requires the weighing of all factors which bear upon a child's physical, intellectual, moral, and spiritual well-being. *Id*. The Superior Court has warned that, "when courts fail to provide children with a permanent, safe, stable and loving home, the result is 'all too often, catastrophically maladjusted children'". *In re Adoption of K.B.*, at 1174.

While the preservation of family is a consideration, "the goal of preserving the family unit cannot be elevated above all other factors when considering the best interests of the children but must be weighed in conjunction with other factors." *In re Adoption of K.B.*, 311 A.3d 1166, 1174, appeal denied, 319 A.3d 506 (Pa. Super. 2024). Consequently, the Pennsylvania Superior Court has held that it is an abuse of discretion for the orphans' court to rely exclusively on the biological nature of a relationship and contact with the blood relative when considering an adoption petition, rather than considering the entire record to determine what is in the best interests of a child. *Id*. Again, although the existence of a biological relationship is a relevant factor to consider when evaluating an adoption petition, it is not a controlling one. *Id.*, citing *Adoption of D.M.H.*, 682 A.2d 315, 319 (Pa. Super. 1996). Furthermore, existence of emotional bond between child and one of prospective custodial parents is an important fact in making best interest determination in adoption proceeding. **23 Pa.C.S.A. § 2902(a).**

15

The proceedings in an adoption hearing are unique and involve parties, experts, investigators and non-parties to a greater extent than in custody hearings, but ultimately are subject to the same standard, that being the best interest of the child. *In re B.L.L.*, 787 A.2d 1007, 1015 (Pa. Super. 2001), citing *In re Adoption of A.S.H.*, 674 A.2d 698 (Pa. Super. 1996). Even though this matter is an adoption case, it has proceeded more like a custody case. In the end, the Court must make a decision based on the best interest of the child. Therefore, it is not inappropriate to borrow the factors considered in custody cases, in particular, the need for stability and continuity in the child's education, family life, and community life, the availability of extended family, the child's sibling relationship, the history of drug or alcohol abuse of a party or member of a party's household, and mental and physical condition of a party or member of a party's household. **23 Pa.C.S.A. § 5328(a)(4), (5), (6), (14), (15)**.

In the instant case, the Minor Children have resided with Foster Parents since June 4, 2022. The Court heard testimony from multiple witnesses to the distinct bond that exists between the Minor Children and Foster Parents. Both L.R. and E.H. refer to the Foster Parents as "papa" and "mama". Throughout the proceedings, the Foster Parents showcased the family unity and bond they created for the Minor Children. The Foster Parents described traditions and activities they do as a family such as biking and going to amusement parks as well as being involved in church programs. The Foster Parents also testified to the close bond the Minor Children have with their biological children and adopted son. Testimony was also presented that Foster Parents extended family, and friends treat the Minor Children as part of the family. The Court heard testimony regarding the Minor Children being enrolled in school and E.H. receiving speech therapy.

While there was testimony regarding a prior bond between E.H. and ~~M...~~ Abdullah, Abdullah has had little to no involvement with the Minor Children since

16

June of 2022. Since that time, *Appellant* has only had minimal supervised visits with the Minor Children. At such visits, CYS caseworkers testified that the Minor Children usually had a hard time transitioning and leaving Foster Mother. CYS caseworkers also testified that they did not observe any notable bond between the Minor Children and *Appellant*. Furthermore, the last time *Appellant* saw the Minor Children was April 1, 2024.

The Court also heard testimony from CYS caseworkers regarding concerns for *Appellant's* mental health and lack of parental skills with newborns, as well as unstable housing and financial concerns. While *Appellant* has not been diagnosed with a mental illness, testimony was presented from multiple witnesses relating to troubling behavior and statements. *Appellant* also reiterated some of the concerning behavior and statements during her testimony.[3] *Appellant* testified that she was aware of the risks of feeding an infant goat milk formula but was not taking steps to monitor if the formula was having any negative effects on the child. Furthermore, at the time of the hearing, *Appellant* testified that she had been residing at her current home for about a year. However, her housing and financial situation was unstable throughout CYS involvement in this case.

In contrast to the evidence establishing the love, support, and care that the Foster Parents have provided for the Minor Children for nearly three years, *Appellant* failed to present any evidence of a beneficial relationship between her and Minor Children beyond the mere fact of genetics. While we do not doubt that *Appellant* loves the Minor Children and has been there in the past to care for them when the biological parents were unable, *Appellant* has had little to no role in the Minor Children's lives since they were placed with Foster Parents in June of 2022.

---

[3] It is important to note that throughout *Appellant's* testimony, the Court observed clear puffing and self-serving statements which weighed against her credibility. (N.T. 170-174, 186-187, 280-281, 284-285, 298-300.)

17

Furthermore, Dr. Christner testified that any reunification of the Minor Children with Appellant would need to be done carefully and gradually. With the long history of this case, the Court finds that the Minor Children deserve permanency and stability now.

For nearly three years now, the Foster Parents have provided for the physical, emotional, educational, and financial needs of the Minor Children. At that time the Minor Children were placed with Foster Parents, E.H. was three (3) years old and L.R. was four (4) months old. Therefore, L.R. has been with Foster Parents for almost his entire life and knows no other parents. As for E.H., she has lived with Foster Parents for very formative years of her life and has formed a connection with them as parental figures. Additionally, both L.R. and E.H. refer to Foster Parents as "Mama and Papa". This Court strongly believes that removing the Minor Children from the Foster Parents would have a negative impact on their lives and emotional wellbeing. The Court also believes it would do great harm to the Minor Children to unnecessarily severe the strong bond that has been developed with the Foster Parents as well as the Foster Parents' other children. Therefore, this Court finds it in the best interest of the Minor Children to be adopted by the Foster Parents,

## CONCLUSION

For the reasons set forth above, the Petition for Adoption by Foster Parents of the Minor Children is granted. Accordingly, the Petition of Adoption by Appellant is denied. A concomitant order will be entered consistent with the foregoing.

18

# IN THE COURT OF COMMON PLEAS
## OF LEBANON COUNTY, PENNSYLVANIA

### ORPHANS' COURT DIVISION

IN RE: ADOPTIONS

OF

J ERH
LNR, and

Docket No.: 2023-759, and
Docket No.: 2023-760

CHILDREN'S FAST TRACK

### ORDER OF COURT

AND NOW, to wit, this ___21st___ day of July 2025, after careful consideration of the record, it appears to the Court that the issues raised by Appellant, C , Concise Statement of Errors Complained of on Appeal have been previously addressed in our Order and Opinion dated May 30, 2025.

The Court hereby directs the Clerk of Orphans' Court of Lebanon County to transmit the record, together with this Order and the attached Opinion, to the Pennsylvania Superior Court for its review, pursuant to Pa.R.A.P. 1931, no later than July 25, 2025.

BY THE COURT:

_____, J.
CHARLES T. JONES, JR.

cc: Lebanon County Children and Youth Services
Roberta J. Santiago, Esquire
John J. Ferry, Jr., Esquire
Caleb J. Zimmerman, Esquire // 466 Jonestown Road, Jonestown, PA 17038
// P.O. Box 120, Myerstown, PA 17046

2025 JUL 21 A 10: 43
LEBANON COUNTY

SCANNED IMAGE

# IN THE COURT OF COMMON PLEAS
## OF LEBANON COUNTY, PENNSYLVANIA

## ORPHANS' COURT DIVISION

IN RE: ADOPTIONS

OF

E.R.H     ., and

L.N.R,

: Docket No.: 2023-759, and
: Docket No.: 2023-760
:
: CHILDREN'S FAST TRACK
:

**APPEARANCES:**

Roberta J. Santiago, Esquire

For : S.F.B.
     L.Y.B.

John J. Ferry, Jr., Esquire

For the Minor Children

Caleb J. Zimmerman, Esquire

Guardian Ad Litem

C.G.

Self-Represented Litigant

## OPINION BY JONES, JR., J.:

The following Opinion addresses the issues raised by Appellant, C.B. ( ) (hereinafter "Appellant"), in her Concise Statements of Matters Complained of on Appeal included in her Notice of Appeal to the Superior Court. The Notice of Appeal was filed with the Lebanon County Court of Common Pleas on June 30, 2025.

Appellant's Concise Statement of Matters Complained of on Appeal raises seven (7) specific issues, pertaining to our decision entered on May 30, 2025, regarding the contested adoption of minor children L.R. and E.H. (hereinafter "Minor Children").

## FACTUAL & PROCEDURAL HISTORY

V.R. (hereinafter "Mother") and C.R. (hereinafter "Father") are the biological parents of the Minor Children. Lebanon County Children

2

SCANNED IMAGE

and Youth Services (hereinafter "CYS") first became involved with the family on May 2, 2022, as a result of incarceration and drug use by Mother and Father. At that time, the Children were living with the maternal grandmother, Appellant ˌ. On June 1, 2022, while in the care of Appellant , CYS received a second referral, and a safety plan was put in place.

On June 3, 2022, Father signed a Voluntary Placement Agreement and the Children were placed into a CYS approved foster home with S.F.U. and L.U.B. I ___, _____ (hereinafter "Foster Parents"). On August 1, 2022, the Minor Children were found dependent. On September 26, 2023, CYS filed a Petition for the Involuntary Termination of Parental Rights for both Mother and Father. Following a hearing, the parental rights of Mother and Father were terminated on December 18, 2023. The Children have remained in the care of Foster Parents since July 13, 2022.

On January 2, 2024, Appellant filed a Petition for Adoption of the Minor Children. On January 4, 2024, Foster Parents filed a Petition for Adoption of the Minor Children. Appellant also filed a Complaint for Custody against the biological Mother and Father on October 27, 2023. On March 6, 2024, the Court entered an Order ruling that because there was an adoption hearing scheduled regarding the two separate adoption petitions, the custody complaint was dismissed. Appellant filed a timely Appeal to the Superior Court of Pennsylvania. On December 24, 2024, the Superior Court remanded the case back to the trial court after affirming the trial court's decision to dismiss Appellant's '; Complaint for Custody.

While the Appeal was pending, the Court conducted evidentiary hearings on the contested adoption petitions on June 25, 2024, August 15, 2024, September 9, 2024, and November 17, 2024. The testimony covered the entire procedural history of the Dependency Matters that resulted in the termination of parental rights of the

3

biological parents. The testimony also covered the current status of the Children. A detailed summary of the relevant testimonial evidence elicited during the evidentiary hearings is included in the Court Order and Opinion dated May 30, 2025, attached hereto as Exhibit A.

On February 10, 2025, Foster Parents filed a Brief in Support of their Petition for Adoption of the Children. Also on February 10, 2025, the Guardian Ad Litem filed a Brief regarding the Contested Adoption. On February 11, 2025, Appellant filed a Brief in Support of her Petition of Adoption. On February 12, 2025, the Attorney for the Children filed a Memorandum in Support of the Petition for Adoption by the Foster Parents.

Following the evidentiary hearings on the contested adoption petitions and the parties' submissions of briefs on their respective positions, this Court entered an Order and Opinion on May 30, 2025, denying Appellant's Petition of Adoption of the Minor Children and granted the Petition for Adoption by Foster Parents. On June 30, 2025, Appellant filed a timely Notice of Appeal and Concise Statement of Matters Complained of on Appeal.

## DISCUSSION

Appellant's Concise Statement raises seven (7) issues on appeal. The first matter Appellant complains of on appeal is that the trial court committed an error of law and/or abused its discretion when the Court found that adoption by Foster Parents was in the best interest of the Minor Children. The second matter Appellant raises in her Concise Statement is that the trial court erred in finding that CYS made reasonable efforts to reunify the family. The third matter Appellant complains of on appeal is that the Court abused its discretion by failing to consider the bond between the Minor Children and Appellant. The fourth issue Appellant complains of on appeal is that the trial court failed to properly consider Appellant's Petition for

4

Custody or visitation. The fifth matter Appellant raises in her Concise Statement is that the trial court permitted her legal counsel to provide negligent representation. The sixth issue Appellant raised is that the trial court subjected Appellant to discrimination or bias regarding religious principles and practices. The last matter Appellant complains of on appeal is that the trial court's actions violated Act 101 of 2010.

I. <u>The trial court applied the best interest standard when making its decision which includes taking into consideration the bond between the Minor Children and Appellant.</u>

It appears to the Court that the issues one and three raised by Appellant on Appeal, relating to the best interest standard and the bond of the Minor Children and Appellant, have been previously addressed in our Order and Opinion dated May 30, 2025 (Exhibit A).

II. <u>The trial court found credible testimony that CYS made reasonable reunification efforts.</u>

Appellant claims that the trial court erred in finding that CYS made reasonable efforts to reunify the family. During the hearings, the Court heard testimony from CYS workers regarding visits between Appellant and the Minor Children. CYS caseworkers explained that Appellant began to attend visits with the Minor Children's biological parents. The caseworkers also explained why Appellant's visits eventually stopped as a result of Appellant's own actions such as not complying with time restrictions and actions that were disruptive to the Minor Children's daily lives. Therefore, the Court found that testimony supported a finding that CYS made reasonable effects to reunify the family.

III. <u>Appellant's issue as it relates to her custody petition is moot.</u>

As to Appellant's claim that the Court failed to properly consider Appellant's Petition for Custody, the issue is moot as the Superior Court issued a

5

decision on December 24, 2024, affirming the trial court's decision to dismiss ?
Appellant's Complaint for Custody.

IV. Appellant's issue regarding the trial court's involvement in her counsel's alleged negligent representation is without merit.

Appellant's Concise Statement also raises the issue that the trial court permitted Appellant's legal counsel to provide negligent representation is without merit. It is not within a Court's purview to dictate or raise issues regarding an individual's chosen legal counsel's representation. The Court's role is to ensure a fair legal process, not to interfere with a party's choice of representation or the way their chosen counsel handles the case. Furthermore, the trial court notes that courts are prohibited from discriminating against parents based on their religion in custody or adoption cases. Religious preference did not enter the Court's consideration when entering its Order and Opinion. More specifically, the trial court applied the traditional test used in adoption cases - determining what is in the best interest of the child.

V. The trial court did not violate Act 101 of 2010.

With respect to Appellant's last issue raised on appeal, Appellant claims that the trial court violated Act 101 of 2010 (42 Pa.C.S. § 6301 et seq.). Act 101 of 2010 amended the Adoption Act to provide the option for adoptive parents and birth relatives to enter into an enforceable voluntary agreement for ongoing communication or contact between the child and the birth relative or between the adoptive parent and the birth relative. The agreement must be one that: (1) is in the best interest of the child; (2) recognizes the parties' interests and desires for ongoing communication or contact; (3) is appropriate given the role of the parties in the child's life; and (4) is subject to approval by the court. Act 101 provides that the agreement shall be filed with the court that finalizes the adoption, and that the court shall approve the agreement if it finds that the agreement has been entered knowingly

6

and voluntarily by all parties and is in the best interest of the child. In the instant case, Foster Parents testified that they do not wish to enter into a contact agreement as it relates to the biological family of the Minor Children. The clear language of Act 101 of 2010 states that it is a **voluntary** agreement. Moreover, the Act provided that the court shall only approve such agreement if it finds that the agreement has been entered into knowingly and voluntarily **by all parties**. As not all parties were willing to enter into a contact agreement, the trial court did not violate Act 101 of 2010.

This Court carefully considered the testimony from multiple evidentiary hearings on the contested adoption petitions and the record as a whole when it came to its determination that it is in the best interest of the Minor Children to be adopted by the Foster Parents, _____ _____ s. The Court would also note that for nearly three years now, the Foster Parents have provided for the physical, emotional, educational, and financial needs of the Minor Children. At the time the Minor Children were placed with Foster Parents, E.H. was three (3) years old and L.R. was four (4) months old. With the long history of this case, the Court finds that the Minor Children deserve permanency and stability now.

## CONCLUSION

For the reasons set forth above, and in our Opinion dated May 29, 2025, this Court denied Appellant, _____ _____ Petition of Adoption of the Minor Children and granted the Petition for Adoption by Foster Parents, _____

Upon careful review of the record, the Court remains steadfast in its decision and submits this Opinion for review by the Pennsylvania Superior Court.

7